Robert M. Charles, Jr. and Allison Whitehill, Counsel for Appellant, Al-Bab USA, Inc. Michael Rowland, Counsel for Diapolee, GPMI, Co., Seth Goldman, Counsel for Diapolee, Envoy Solutions, LLC. All right. I see four bright, shining faces. Do we have a counsel? Thank you, Your Honor. Robert Charles and Allison Whitehill for Appellant, Al-Bab USA, Inc. Okay. Before we talk, may I ask a couple of housekeeping questions? Will you be splitting the argument, Mr. Charles, or will you be presenting the argument? Your Honor, I will be presenting the argument unless you ask a hard question. I may ask Ms. Whitehill to answer it. I'm glad you're here, Ms. Whitehill. And from the appellee side, do you folks anticipate splitting the argument in some fashion, or is Mr. Wallen going to take the labor in order? Good morning, Your Honor. Michael Rowland for Diapolee GPMI Litigation Trust. Yes, I'll be conducting the argument, but similar to Mr. Charles, Mr. Goldman will be here to answer any questions if you have questions for Envoy. Okay. Thank you very much. Okay. Mr. Charles? Thank you, Your Honor. And we'd like to reserve three minutes for rebuttal. Okay. This is a case where a debtor used exclusivity to direct a sale of its equity without bidding to a buyer willing to employ debtor's principle and to create a liquidating trust and appoint that same debtor's principle as the trustee with virtually unfettered discretion. To avoid an appeal, the debtor sought to have the confirmation order immediately effective, and they seek dismissal of the appeal on mootness grounds. Plan confirmation should be reversed for two reasons. The plan violates the absolute priority rule and because the plan improperly selected debtor's principle as the liquidating trustee. Very briefly on the background, because I know you've read the briefs, this plan was filed on the expiration of the third extension of plan exclusivity. It was confirmed within 45 days within solicitation exclusivity. In that plan, Envoy, Mr. Goldman's client, buys the equity of the reorganized debtor for a fixed price without bidding or competition. The proceeds that Envoy pays essentially satisfy only administrative professional expenses, dip loans, many of which are related to the debtor's principles. It funds a purchase by Envoy of equipment on a rejected equipment lease for over $1 million cash, and it funds a $500,000 pot in the litigation trust. The debtor's principle, Yaron Bender, I'll call him Mr. Bender, is going to be remaining employed by the reorganized debtor. On the eve of the confirmation hearing, we learn he gets a $100,000 signing bonus, a $300,000 base salary annually, a bonus of at least $100,000, and the possibility of another $500,000 bonus. With respect to litigation trust, it's essentially funded by claims against our client, which have been asserted, and an entity called Michelin. The trustee, Mr. Bender, has broad discretion with respect to the trust, although there is a supervisory oversight committee. The trustee, though, in terms of discretion, gets to decide how claims are managed, paid, what happens with respect to distributions if there are disputed claims like our client's. What's the oversight, Mr. Bender? There are three members of the oversight committee. They essentially, as I read the documents and there's inconsistency between the plan and the trust agreement, they look to me like a consultation as opposed to, for example, a prior approval sort of oversight. Our client, Your Honors, is put in its own class. Its claim is disputed. That claim is allowed temporarily for voting purposes. It rejects the plan. So, therefore, we are in crammed down mode. And as I indicated, the plan was filed. The first confirmation hearing was the Wednesday before Thanksgiving. The evidentiary hearing on plan confirmation was five days later, and the plan was confirmed later that week. This plan violates the absolute priority rule. 1129B2A, B2B, the unsecured creditors receive or retain in a context where our class six is not paid in full present value. The appellees argue that the debtor didn't retain anything. Someone else bought the equity of the company. And while someone else bought the equity of the company, just as in LaSalle, the debtor controlled the entire transaction through exclusivity. The debtor controlled who the purchaser was, what the price was. Your Honor. Didn't your client have an opportunity to be involved with MCI and look at buying it? Yes. And that's... Well, I mean, I don't understand. You know, I guess there's a question about the title of what MCI is, whether they're a financial consultant. But if they're acting actively to market it, and anybody, including your client, could engage in those discussions, what's the problem? Your Honor, think about, if you would, LaSalle, and the difference between listing the floors in that Chicago office building for sale, where anyone can make a bid, and the circumstance in that case where the plan has been crafted, its terms are known, but the objecting creditor was not allowed to bid for that equity in the reorganized debtor, and it was not allowed to propose a competing plan. I don't... There's a lot of sale transactions, significant sale transactions, where there isn't a bidding process. Major $100 million buildings are sold without bidding. They're marketed. And anybody that's interested can make an offer or participate. Here, the creditors were looking for what they Why do we need a bidding process if the marketing is adequate? Your Honor, if we want to rewrite 1129B2B, we can, except that we're not the legislature. That, with respect to this plan, this plan did not offer bidding. There had been no difficulty with offering bidding, except they didn't. Isn't there... Mr. Charles, that's not my question. Mr. Charles, that's not my question, is that you're saying the plan didn't offer bidding, but the plan was confirmed after there was marketing. Why do you need bidding if there's adequate marketing? Your Honor, once the terms of the plan are known, in the same way that when you have bidding for a market bid against the contract, here the debtor and MCA and the buyer did not let anyone bid against the contract. They picked the buyer. They drafted the deal. It's not an asset sale. It's an equity sale, and it's not a purchase agreement. It's a plan of reorganization. And there was no competition. Okay, that's important, whether there was competition or not. But do you need bidding to make a competition? When you sell businesses, sometimes you get financial consultants or an agent or someone else working in this, and you scour all the potential purchasers, and you try to figure out what they're willing to offer. And at the end of it, you can pick, if you're comfortable and you exercise your business judgment, the highest one is on the table, you can take. You don't have to necessarily have to do. Agreed, Your Honor, under 363. And this is a sale pursuant to a plan where 1129 is in play. And you have to satisfy 1129B in order to confirm this plan. Well, I think there's two issues here. Now, I'll give you my own version of skepticism. I don't know that LaSalle is anywhere near as directive as you're suggesting it is. I think the point of LaSalle is, if you really are getting something on account of your equity interests, that is suspect and potentially problematic. And we have to be careful about how closely the debtor controls and frankly, constricts the process. There's a big difference between a preamble to the plan, where people can come in, kick tires, do whatever they want, make suggestions, make offers, the debtor, you know, is open to those, and you get to a plan and the plan gives you some structure. Those are two different questions to me. So the idea that the plan didn't give you everything you want is indicative of nothing on the absolute priority rule as far as I'm concerned. So tell me where I'm wrong with that. Your Honor, with respect to the plan, if the plan does not provide for payment in full of the objecting non accepting creditor, then the absolute priority rule is in play. And how is that? I mean, is Mr. Bender receiving something on account of the fact that he had an equity position? Yes. Is there a case that says that analogous to this? I've never seen anything as creative as this. I apologize. I've never seen a case that says it goes that far. Well, Your Honor, that the interesting thing about what what was done here is not only does Bender get to sell the fund that he also appoints himself as the litigation trustee, where he gets additional benefits. And so it's a different case. You know, unfortunately, most tie the two together for me, if you could, because there are, you know, the argument from the other side is that Mr. Bender got nothing from his equity interest. What he's getting is a job because of his skills, and he's providing new services. And the job that he's doing, he was hired for it because he's the best person, not because he used to have an equity interest. And Your Honor, I do think this is directly analogous to LaSalle, where the court did valuation evidence, and everyone believed except the Supreme Court, that this valuation evidence provided that kind of protection that the absolute priority rule was otherwise intended to provide. And the Supreme Court said, there is no reason that is unless the very purpose of the whole transaction is at least in part to do old equity a favor, that this is done with the protections of exclusivity. And I respectfully submit that's our situation. So why didn't the creditors committee think that this was favorable treatment to Mr. Bender? They seem to support it. Your Honor, I can't, we were never invited into any of those conversations. So I couldn't even give you hearsay about that. It's clear we're the target, and we're going to be painted with the black brush. And that's all I can tell you is, we're just the target and the methodology that was used to execute this plan violates the absolute priority rule in 1129A5. I'd like to save the bulk of my time for rebuttal. So I just very lightly say, with respect to 1129A5, that when you select an interested person, who's going to be the principal witness for the claim, to say that that's a trustee appropriate with the interests of creditors, and the public interest under 1129A5 seems to me fanciful. And with respect to mootness, you know, we could and we may have to work our way through Trans West. But when you reverse confirmation of the plan and Trans West for violation of 1129A10, and say you can grant effective relief, that injured party is a party to the appeal, just like Mr. Goldman's client, because perhaps you can grant damages for that reversal. It's clear that adequate relief can be fashioned. And that's the job of the court on remit. Your Honor, so I'd like to reserve the rest of my time for rebuttal unless you have additional questions. Thank you very much. Okay, Mr. Rowland. Good morning, Your Honors. Michael Rowland for Appalachee Pimile Litigation Trust. May it please the court. This appeal is about a plan that was confirmed with the support of 100% of the voting unsecured creditors, other than ALBAD, after a year long marketing effort to 32 different suitors. The plan saved the debtor's business and the jobs of its 27 employees by selling the operations to Envoy and gets unsecured creditors paid from the proceeds of a $19 million lawsuit against ALBAD and a $2 million lawsuit against Michelin. It comes as no surprise that ALBAD, as the target of the litigation trust, would seek to upend this plan, but its arguments on appeal are based on a mischaracterization of the record. First, the plan satisfies the absolute priority rule because equity holders don't receive or retain anything on account of their equity interests, and therefore LaSalle is not a good fit. But even if LaSalle did apply, all it requires is that the sale be market tested. And while ALBAD tries to create the illusion that the debtor's owner abused the exclusivity period to cherry pick a buyer that would line his own pockets, the reality is that the business was exhaustively marketed for over a year and that through that extensive search, Envoy emerged as the best and, in fact, only willing buyer. Second, we know it is consistent with the interests of creditors for your own Bendor to serve as trustee of the litigation trust because the unsecured creditors committee specifically requested it, creditor body voted overwhelmingly in favor of it, and nobody has objected to it other than ALBAD, the primary litigation target. ALBAD tries to create the illusion that the trust gives Mr. Bendor unfettered discretion that he will abuse to the detriment of creditors, but the reality is that the trust agreement puts the oversight committee in control of among other powers and creates a mechanism for any party, including ALBAD, to petition the court to remove Bendor for cause if he does abuse his authority. With that kind of record, the bankruptcy court's finding that the plan satisfied the absolute priority rule and the best interests of creditors is not clearly erroneous, and therefore, ALBAD's appeal should be denied. Let me ask you a question about the, I know I've read this, but give me your version of the definition of trustee in terms of disinterest. Well, Mr. Charles cites Henry AFI, which creates, which talks about the requirements for a Chapter 7 trustee, which requires that they be disinterested. No, I don't think it's exactly that, but I'm sorry, go ahead, you finish. Yes, and my point is that that's not correct. We're not talking about a Chapter 7 trustee here, so that requirement doesn't apply, but even if it did, under the code, the definition of disinterestedness is simply that they not have an interest materially adverse, and there is no evidence in the record here that Mr. Bendor has a materially adverse interest to the unsecured creditors. In fact, all the evidence in the record is that his interests are that that president, for the benefit of the corporation, is very interested in recovering as much money as possible. Here, creditors want to recover as That's exactly right. He has a residual equity interest to the extent he's a prior equity, but he would only get paid from the proceeds of the lawsuits in the event he gets a huge win, and all the unsecured creditors are also paid. And yes, he gets paid as trustee for serving in that role, but any trustee is going to get paid for their services. And in fact, Mr. Bendor agreed to something that I think we would have trouble finding any other person to agree to, which is he doesn't get paid until the creditor body gets at least a 25% return. He doesn't get paid at all. And if you look at the numbers, the way that works out, he has to get some big wins in these lawsuits in order to get that return in order to see any compensation for his duties as trustee. Well, if I take that a step further, I mean, there are two large claims here, right? Correct. Okay. I mean, what you're really saying is he either hits or he doesn't on those, right? If he does, 25% is a floor, but he's going to be way beyond that if he does hit any of these, right? Is that the theory? I think that's probably likely. That's a stretch. Tell me. But I mean, that's what I thought I was reading into this. I think that's probably likely that if we win, we get a good win. Our firm is not handling the adversary litigation, so I don't want to speak out of turn, but I do think that if we win, then we probably hit that 25% mark. That is, if we win in the All Bad litigation. The Michelin litigation, standing alone, is not enough. Got it. That's a 25% mark. All right. So you either have a successful conclusion of All Bad, and he gets paid, or you don't on the contingency. That's right, Your Honor. All right. And I would also point out that the Unsecured Creditors Committee specifically wanted Mr. Bendor. And let's remember for a second that Unsecured Creditors, they don't get paid anything unless these lawsuits pay off, and that was quite an agreement by them. And the reason they were willing to agree to that, the bargain that they struck, they said, all right, we're willing to agree to that scenario, but we want Mr. Bendor as the trustee. And there was comments by committee counsel at the confirmation hearing that they seriously considered whether to have an interested trustee of the litigation trust and whether they really wanted Mr. Bendor, and they decided that they did. I believe the precise language was that it would seriously disadvantage the trust not to have Mr. Bendor in that role because he knows everything about these cases. He's lived through them. He knows all the facts. Mr. Charles objects to the fact that he's a witness, but it is precisely because he has an intimate knowledge of the case and the legal strategy that he's been involved in for over a year that makes him a very suitable trustee. Yeah, I think it's hard to imagine a scenario where he's not involved. So, you know, what I think the question for Mr. Charles will be is, well, why is it significant that he's the trustee? He was going to be involved. And is there something about the fact that he's the trustee that's particularly noxious here? And for Mr. Charles, maybe there is, but that's the way I'm seeing this. And I think another important point is that contrary to Mr. Charles' characterizations, the trust agreement does place significant control and oversight in the hands of the Oversight Board. Two of the members were selected by the Unsecured Creditors Committee. He wants to paint a brush that debtors selected or got to select the entire committee. That's not the case. It was two of the committee members or two of the members were selected by the committee. And the trust agreement, most notably in paragraph or Section 3, requires committee approval for some of the most important powers. For example, Mr. Bendora cannot liquidate trust assets. He can't calculate and distribute claims. He can't settle the causes of action without the agreement of the committee. And this is not a merely oversight role, as Mr. Charles tried to characterize it. It is the agreement is required. So that is a significant power. And, again, the counsel for the Unsecured Creditors Committee at confirmation said we worked hard to get these controls in place. So would it be fair to say that the trustee is basically the real party? He will be the plaintiff? He will be directing the litigation, but in consultation with the Oversight Committee. But, for example, he can take any number of steps in the litigation without their approval, right? So the authority to initiate the actions and to prosecute the actions, that is within his authority, but subject to the agreement of the Oversight Committee. It is part of that paragraph that requires the agreement of the Oversight Committee. So they have to be involved. They have to be signing off. He is on the front lines. They don't have to be consulted on the day-to-day. He's the day-to-day manager, as it were. So I think your characterization is correct, but I just don't want to lose sight of the fact that the Oversight Committee has to agree to significant decisions here. Well, they have to agree to a settlement. I mean, what else do they have to agree to? So settlement is the big one, initiating the causes of action. The term prosecute is in that paragraph. They have to consent to prosecuting the lawsuit. I would bet that's decided, but, yeah. Yeah, so I think you're right. I mean, and settlement is the important point here. I mean, to the extent that there is concern that Mr. Bendora is going to abuse his authority to settle the actions prematurely for some reason, even though he would have no incentive to do that, that decision needs to be made with the agreement of the Oversight Committee. Well, and you would think that a premature settlement would be something Mr. Charles would be delighted with. Well, that's exactly right. But who knows? Maybe not. Okay. Mr. Rowland, the attorneys that are handling this lawsuit can solve that. Their obligation is not to trustee but to the trust, correct? Correct. That's correct, Your Honor. If I may move on, unless there are any additional questions on the best interests of creditors issue here, I would like to touch on briefly at least the equitable mootness issue. I do think this presents a very classic equitable mootness case where all the payments and transfers that were to occur occurred and really cannot be unwound without significant damage to other parties. And All Bad really fails the first prong of that test in that they didn't diligently seek a stay. They did seek a stay, but you have to do more than just check the box. It's not a perfunctory act. You can just seek a stay without any regard. Can I tell you, I was on the panel that considered the stay at the VAF. Mr. Charles was quite vigorous for what that's worth. And I don't challenge the vigorousness of his argument but rather the timing in which it was made. Okay. They did not file that motion. Mr. Rowland, if you prevail, doesn't the equitable mootness argument become moot? Well, certainly I think that we prevail on the merits. And so, yes, that is correct. But I guess I would ask if the panel has any other questions about equitable mootness, or I could move on to the absolute priority rule. Well, what do you make of Mr. Charles' argument that I think is quite plausible, that if you read Trans-West, you know, they sort of imagined things that could happen if the case went back, which I think is one of the problems with this document. It's sort of this let's deem a whole bunch of things to be possible and then nothing's ever mooted. I mean, put this through the Trans-West prism for me and tell me why this is equitable moot. So we can't unwind these transactions. First of all, we have a number of transactions, about $3.8 million of the 4.3 that came in. 3.8 went out to third parties. So we'd have to claw all that back, which is generally not something that you're supposed to be able to do under the equitable mootness doctrine. You also have $500,000 in the litigation trust, a good chunk of which has already been used on attorney's fees because for six months the cases against Allbad and Michelin have been prosecuted. You would also be talking about defunding the litigation trust in the entirety, in which case you have two cases that are pending in which the debtor has no funds to continue prosecuting them. Obviously, that's an outcome that Allbad would love, but that is not at all an effective or equitable relief on remand. You also have Envoy that has been not only operating the debtor's manufacturing operations, but vertically integrating them into their own distribution network. And there was testimony on that at the confirmation hearing and in Mr. Vendor's declaration going in that a big part of his job as chief manufacturing officer would be to integrate the manufacturing operations into their 20-affiliated company distribution network. So that involves implementing new procedures, I imagine, and changing the infrastructure. Envoy is different, the reorganized debtor is now different. How do you unwind all that? And I honestly can't imagine how. And I would point out that neither in their brief or in their reply did Allbad propose any way to do that in the event that this confirmation order were entirely reversed. The only thing they talked about is, well, we can get partial relief. Since you're almost, you've only got a couple minutes left, I would very much like to hear your response to the absolute priority rule. Yes, Your Honor. So let's set aside just for a second the fact that LaSalle doesn't really apply. It's not a fit. I do want to get back to that. Because that's a new value contribution case for equity. There's no equity here. They're trying to shoehorn it in, but it just doesn't fit. Even if it applies, all it requires is marketing. And there is a lot of evidence in the record that the sale was diligently marketed over a year. Thirty-two potential buyers were talked to, including 20 investor financial buyers, 12 strategic buyers like Envoy, like Allbad. And they reached the due diligence phase and executed NDAs with 15. So even if marketing is required, all the evidence in the record says that it was marketed. Now, Mr. Charles says, okay, well, we need bidding procedures. But that requirement is kind of being pulled out of thin air. They don't cite any cases where that is required. And, in fact, LaSalle expressly stopped short of saying that that was required. Page 458 of that opinion, they said, you know, whether bidding, say, an opportunity to offer competing plans or the right to bid for the same interest, self-held equity, whether that's required is not a question we decide here. So LaSalle stopped short of requiring that. There's no cases that do require it. And, in fact, it would have been not only did we not have enough time to do that, also it would have been duplicative of the year-long efforts that had already occurred. So on clearly erroneous review, marketing had occurred, even if we accept for the sake of argument that LaSalle applies, which we would say it doesn't. Well, and it's only an issue if equity took, got value in exchange for its shares, right? And your argument is that they didn't. It was, you know, he got the job based on his skills. That's exactly right. He didn't receive equity. He didn't receive property under the plan. His employment was not required by the plan. It was actually negotiated after the plan was proposed and filed with the court. So it was really on a separate track and was not received under the plan at all. So I see I'm out of time. If the panel has any additional questions, I'm happy to answer them. But if not, we would just conclude by asking the panel to affirm the confirmation order. Okay, any other questions? Okay, thank you very much. Thank you. Okay, Mr. Charles, you've got just under three minutes, I think. Thank you, Your Honors. With respect to your question on selection of Mr. Bender as the trustee, the concern is not that he goes too low. It's that when he's the principal, he's not going to resolve this case unless he gets a win that vindicates his position and probably gets money to him. And that's different than a trustee in any kind of sense, whether Chapter 7 disinterested or not. You could put him on the oversight board. He'd have input. But instead of having some person that is in the best interest of the creditors and the public choosing litigation strategy with oversight committee, you have the partisan. That's our view. With respect to the absolute priority rule, the difference between marketing, then picking the plan, filing the plan under exclusivity without any competition, and marketing, filing the plan with the opportunity for competition, is either someone can bid against the plan. I'd like to offer $8.4 million or whatever. Or someone can file a different plan. If, in your single asset case, the debtor says, trust me, Judge, we've been marketing this property for more than a year, and this offer that we have from the equity is the best offer available, so now ram it through. There's no LaSalle problem. You can't agree with that. You'd perhaps laugh. So then they'd say, well, it's not a new value case. That's why here the debtor isn't receiving or retaining on account of the plan any equity. Well, the individual who's the person who uses exclusivity to propose this buyer on these terms does get, and they have to concede, significant personal value as an employee does get, and there's no debate that he gets the right to be the litigation trustee and he creates this with exclusivity. Why? If there's nothing going on with respect to the benefit for equity, why did they use exclusivity, and why did they prevent competition? And LaSalle says, you don't need to get into the what's the right way to do it. We know this is the wrong way to do it. And this is actually the same problem if you were the general counsel and you owned one share of stock. If the general counsel, no, because the general counsel doesn't control the exclusivity. Mr. Bender is the decision maker for the debtor in possession. Okay. But I mean just in terms of his appointment. If the general counsel were appointed as the trustee, possibly, but he wouldn't have a personal interest in the outcome and he wouldn't be the witness. He'd be the lawyer. Okay. So, your honors, we respectfully request that the court reverse the order confirming the plan, remand to the lower court for appropriate relief, both termination of Mr. Bender as litigation trustee, and other relief such as the court suggested in Trans West. Thank you so much for your time. Thank you for your excellent arguments. That was a pleasure. Thank you very much. Thank you. Thank you. Thank you, your honors. Okay. Next matter.
judges: Lafferty, Brand, and Corbit